case United States v. Castillo. Oh, Mr Kluge, I should have noted that you're court appointed and we thank you very much. Mr. Rodriguez. Good morning, Your Honors. My name is Valentin Rodriguez and I represent the defendant in this case, the appellant. Your Honors, I was also appointed to this case and handled it in the district court. We took a plea in this case a couple of years ago. We had the right to argue that the safety valve was applied improperly. We also, Your Honor, have filed a motion to dismiss in the trial court, which was denied based on 11th Circuit precedent. My client, Your Honor, as you probably know, was a Guatemalan fisherman who had no connections whatsoever to the United States. He was on a fishing vessel off the coast of Guatemala, about 2,000 miles from the United States. In the high seas, correct? Yes. And he was interdicted by the Coast Guard, along with the others. They were held at sea for 19 days. That's part of our argument on due process. The problem with that one is that he pleaded guilty. Yes. Waives any right to complain about the conduct of the government leading up to that guilty plea. Normally, I would agree, but I think it also ties into jurisdiction, which I believe you can raise even if you plead guilty, because I believe that the jurisdiction is improperly applied where you violate a person's rights by holding them at sea for 19 days before bringing them to the United States. That's sort of the argument. I don't understand that. The argument is, Your Honor, I'm sorry. Why would the detention have anything to do with jurisdiction? It's our position that by holding them there for 19 days, they violated the provision of the MDLEA, which requires a person to be brought in without an unreasonable delay. And if you violate that, then therefore there's no jurisdiction to bring the person into the United States. And that's our argument on the 19-day delay. I have a question about the 19-day delay. I mean, part of that time, they've got to go through the Panama Canal. I mean, there's some travel involved, right? But my question is about the six days. From the day the Coast Guard boarded the ship until when they asked Guatemala to waive jurisdiction, I understand six days passed. What was going on during that? That was our argument, that why did you wait six days to get permission from the Guatemalan government? And then the Guatemalan government took several more days before they finally gave permission. There was no explanation in the record for the delay other than it just happened. You see, the problem with these cases is things like this happen on the high seas. Before the person even gets to the United States, the evidence is gone. They destroy the ship on the seas and basically bring the person in, ship the drug somewhere else, and they appear here. There's really no way to figure out why there was a six-day delay before they even asked the government. I would argue that that divests the Court of Jurisdiction just because they waited six days. There's no case on point. And what case law supports the argument that that requirement is jurisdictional? Just the plain language of the MDLEA, which requires no unreasonable delay. And what case suggests that that kind of provision, that there be no unreasonable delay, is jurisdictional? I've never seen anything like that. Well, because the statute itself is what creates the jurisdiction, Your Honor. But the statute, though, gives the United States court the power to entertain that kind of action, right? Correct, but if you don't follow the statute... Every provision of the statute, there are all kinds of provisions like that that aren't jurisdictional. They don't go to the power of the court to hear the case. Correct. Several courts have looked at the different parts of the MDLEA and determined whether they were properly applied, whether they were violated or not. But not every provision of the act is jurisdictional, right? No, but we would argue, it's my argument, that this provision of it is because it has to do with bringing a person to the United States. It has to do with actually literally transporting the person here so that we have personal jurisdiction over them. If it's not jurisdictional, then you would agree with me that the guilty plea waives this issue? Absolutely, Your Honor. We would agree with that. And that's why our primary argument today is on the safety valve, which I understand there are two unpublished opinions, one of which you talked about, Your Honor. And in the one unpublished opinion that you meant that you're a part of, it was United States v. Echolino-Guizamino-Cortez. You talked about persuasive evidence regarding equal protection claims and whether the evidence that the government presents is persuasive. My argument particularly is that in this case, the government has told you in its briefs and will argue shortly, probably, that the reason that we can treat persons like my client differently is because of this international trafficking of drug globalization targets the larger root intentional trafficking of illegal drugs before the drugs reach the U.S. But I think that is not a rational reason. Why wouldn't it be rational for Congress to say, look, the inherent difficulty of policing international drug trafficking, particularly on the high seas, calls for a harsher penalty? Because we also have established that these crimes need to have no nexus to the United States. So what we're saying is the crime does not have to have a nexus to the United States. The case law is clear except out of the Ninth Circuit. No nexus needed, but the rational reason that we can distinguish differently is because these drugs are heading to the United States or affecting the United States. So it's our argument that if you don't have to have a nexus to the United States for any of these crimes, clear established case law, then how can the reason that we have a distinction between the two different types of crimes and defendants be relied upon because of a nexus? So that's the circular argument. In this case, the government just comes up with its reason. Okay, international drug trafficking is bad. And I understand, Your Honor, you've already determined that that is, in a prior unpublished opinion, a rational basis and a legitimate basis. And, of course, that occurred after we filed our appeal. But we believe that it really isn't because it really turns its head on this whole nexus issue. So that's our particular issue as to why it's not rational. The other reason, Your Honor, that you could look at this as not being rational is because it's our position. It's irrational to think that prosecuting wholly foreign drug trafficking is more serious because of its effect on domestic drug trafficking when even defendants who come to the United States, come to Miami from other countries and bring drugs here on ships are treated differently under the safety valve. The crimes are essentially the same, and some may argue they're even more serious when a person arrives here at the Port of Miami with 800 kilos of cocaine as opposed to 2,000 miles in the high seas. So we think that's an irrational reason to have this distinction whatsoever at all. And also, Your Honors, I've mentioned this in my brief about the Article I powers. And, you know, there's a Judge Tortuella out of the First Circuit who I cited in my brief who, of course, it's a dissenting opinion, but, you know, dissenting opinions sometimes become the law, as we know. And the opinion is that, you know, the enforcement of criminal laws of the United States against persons and activities in non-U.S. territory in which there is a lack of any nexus or impact in or in the United States exceeds the powers of Article I under the Constitution. And I maintain that what Judge . . . You acknowledge that we have binding precedent that says that Congress, in fact, can't prescribe this conduct on the high seas under the Felonies Clause? Yes, you have binding precedent in the Eleventh Circuit, but there's no binding precedent as to this issue of whether treating these two types of different criminals . . . Safety valve. Safety valve. There's no binding precedent as to that. And I'd like . . . It only has to survive rational basis scrutiny. Correct. But I'd ask that the legitimate reason be very strictly applied. Safety valve, as this Court probably knows, is something that's not easily given out. As a practitioner, maybe one in 20 clients, you know, qualify for it. There are a lot of hurdles you go through to even become safety valve eligible. And here we have a Guatemalan fisherman who's never been to the United States, no criminal history, who would have received the safety valve because the judge said he would have given it to him. And we just feel that, Your Honor, that violates the Equal Protection Clause. Thank you. Thank you. Mr. Colon? Mr. Rodriguez, you can stay up here at the Council table, please. Good morning. May it please the Court. I'm Jonathan Colon on behalf of the United States, with me at Council table is Scott Benke, who handled the matter in the District Court. I'd like to start with the waiver issue because I think, as Judge Pryor pointed out, this is a threshold issue. And although it was not argued, admittedly, in the government's brief, I think it kind of depends on how you view the nature of the defense claim here, whether it is a class-type issue addressing the constitutionality of the statute or if it's more of an as-applied, how he was treated in this case. It's not a jurisdictional issue. I think that's clear. The jurisdiction of the defendants in this case was established under the MDLEA's procedures and according to the bilateral agreement with Guatemala. So I don't see how it could be a jurisdictional issue. If one is looking at this as how these particular crew members, how this defendant was treated by this delay, then, again, that's not a class issue. That's not saying that the facts as established don't amount to a crime or that the statute itself is unconstitutional. I suppose one could look at it, you know, viewing it from the best defense case, that the fact that the statute allows this type of procedure to happen could weigh on the constitutionality of the statute. And I suppose if you looked at it that way, then perhaps it would fit under the class rationale of that the statute is unconstitutional. Regardless, I don't think even on the merits, if the court is going to address the merits of the claim, that one can establish a due process violation here. The due process clause does not provide the courts with a bright line number of days that it can enforce. What the Supreme Court has said is that a delay can't be punitive and the rules say it can't be an unnecessary delay. And under Purvis, this court asks to look at what is the reason for the delay. And we can look at the 19 days and break it down. What is the reason for that six-day delay? Sure. The initial period of time, what happens in these cases, and this was a case where there was a nationality claim that was immediately, on that first day, the Coast Guard, a Coast Guard-to-Coast Guard procedure under the bilateral agreement with Guatemala, the Coast Guard confirms the nationality claim. So now this is a Guatemalan vessel, which at this point is still under Guatemalan jurisdiction. On the first day, the Coast Guard obtained permission to board and search the vessel, and that was obtained on the first day. Under the bilateral agreement with Guatemala, which was in the record, it was submitted as part of the government's response to the motion to dismiss, that's at 57-1, and if you look at page 3 of 57-1, under Article 7, Section 1B2, the procedure to follow once a vessel is searched and drugs are found is that the boarding vessel that obtained permission to board, I mean the boarding nation, crew, Coast Guard, United States Coast Guard, is authorized to detain the vessel, cargo, and crew while permission is sought and obtained to have primary jurisdiction to prosecute. So that's what's happening at this point. The first six days, the United States is detaining this crew on behalf of Guatemala. At this point, Guatemala still has primary jurisdiction. Now unlike the initial permission to board and search, which is a Coast Guard to Coast Guard communication, under these agreements, in order to request and obtain primary jurisdiction to prosecute, that's a cabinet-level decision, so it's not just a matter of the Coast Guard calling the Coast Guard. That's a decision that has to be made. First the Coast Guard has to inform its base of operations what's happening, and then it has to go all the way up the chain of command, probably to the State Department. I don't think it's the Department of Justice that would make the communication, but eventually someone at the State Department or a cabinet level here in the United States has to communicate with the government of Guatemala. So the record does not say why that took six days in this case, but that's the procedure that has to be followed, is that at some point it has to go up through the Coast Guard to command, to Washington, to some cabinet-level decision to request jurisdiction from the foreign nation under the bilateral agreement. So you're saying before the people there on the scene, the Coast Guard there on the scene, can contact the Guatemalan government and ask for permission to charge these folks, he or she has to get approval from the State Department during that six days? Well, the Coast Guard doesn't get the approval. The Coast Guard, the United States government, has to have approval from the Guatemalan government that we will take jurisdiction to prosecute this case. Okay, but then I didn't understand your explanation. Can you run it by me again? I'm sorry. Let me start at the beginning. You said the Coast Guard is treating it first and is acting on behalf of the Guatemalan government? Under the bilateral agreement, at this point, since it was a corroborated nationality claim, this is a Guatemalan— The master of the vessel made a claim of nationality. Yeah, and it was corroborated. So the Coast Guard can—that's a Coast Guard-to-Coast Guard-level communication. They can immediately call whomever they call the Guatemalan Coast Guard, and they confirm, yes, that's our vessel. So at this point, this is a Guatemalan vessel with people under Guatemalan jurisdiction. The United States Coast Guard can't bring them to the United States. They have then the consent of Guatemala to detain the vessel and crew. Yes. Right. And that's under the treaty, which is— That happens early. Yes. So the first thing was that we got permission, Coast Guard-to-Coast Guard, to board, search, and seize. And then under this provision, which is at 57-1— What comes several days later is the consent to charge. That they will see jurisdiction over the case, the prosecution of this case, from Guatemala to the United States. That permission to give over this Guatemalan vessel to be prosecuted in the United States pursuant to the agreement, that's a Cabinet-to-Cabinet-level thing. And it took six days to make the request, three days for— That's what I want to know. Why did it take six days to make that request? The record does not say, Your Honor. And all we can say is that unlike the immediate, on-that-first-day communication, which is just Coast Guard-to-Coast Guard, this is a decision that's made government-to-government. So that's something that has to go back to Washington, up the chain of command from Coast Guard to base, from base to Department of Justice. To us, this probably has to— Again, I'm spinning out how it may have worked, but— None of that's in the record. How it works? No, it's not in the record, Your Honor. That is just how the treaty regime works. Or how it worked in this case. What happened and why it took six days is not spelled out in the record, Your Honor. But— It's not right that there's no real bright-line number of days for us to assess what would be reasonable and therefore necessary once we move beyond this Coast Guard-to-Coast Guard permission. Is that correct? Exactly, Your Honor. What Pervis asks this court to do is examine the reasons. And if you compare it to, for example, the Zakharov case, which was affirmed in the Ninth Circuit— And I have to apologize. I even undersold that case in my brief. The 11 days that we referred to was the transportation time. Like this case, if you look at the Zakharov case, they were detained five days at sea before they even began transport. So if you look at the total number of days in Zakharov, which was affirmed, that was 15 days, five days where they're detained at sea being searched before they even began to be transported to the United States for prosecution. So that 15-day period of time is more analogous to the 19-period of daytime here. The transportation itself in this case was 10 days. And as Your Honor said, the process clause does not provide a bright-line rule. You must get them there in these days. And it certainly doesn't say to the Coast Guard that you must drop your operations and immediately take detained people in the high seas to the nearest port. That's not what the Bell punitive standard is. It's not what Pervis asks, which asks us to look and see what happened. Were there oppressive tactics being used? Did the Coast Guard wander around the ocean on purpose to prolong the detention so to seek some kind of advantage? In another case, if this court were to see where the person was kept deliberately away from the United States as used as leverage because we're going to detain you indefinitely and use that as leverage for you to waive your rights, that would be something that could possibly in some other case make a due process claim. But the fact that it takes 10 days or six days to go through the procedure, three days to get the consent, and then another 10 days to get someone physically from a ship on the Pacific Ocean through the Panama Canal. They stopped here, we know in this case in Guantanamo, and then were brought to the Southern District of Florida. That's normal. There's no even allegation in this case that any kind of oppressive tactics, improper interrogation, or purposeful delay was employed. They haven't even alleged an improper delay. All they've said is that the fact of 19 days alone is a due process violation, and there is just no basis in this record or under the Pervis standard to say that that is something that this court can find as a due process violation. If I'll briefly just touch on some of the other issues, again, there was a suggestion I think for the first time that the delay may have caused a loss of evidence. I don't think that can be borne out in this record. The defendant pled guilty and admitted to transporting 850 kilograms of cocaine. So whether or not there was no allegation that there was any kind of loss of an ability to contest that fact, he admitted that fact. How long does it take? I should know this, I guess. I mean, how big is the ship and how long would it take to search a ship like that, just in your experience? Your Honor, I believe this was, I believe, although I'm stretching my recollection a little bit in this case, that this was one of the smaller panga-type vessels. The search was the first day. So it was done the first day. Zakharov is the case where the search took several days, and I don't know what was going on in that Ninth Circuit case. In this case, this was seized on the first day. Okay. So the search was complete the first day. As far as I recall, Your Honor, that it was not. Your trial counsel is nodding. Yes. So I recall correctly, I hope, that no one is suggesting that the search is the reason that it took the six days to go through the process of obtaining the request and then three days more of the permission to get jurisdiction. I can quickly address the equal protection argument, I think, as this Court has held in its recent unpublished decisions, that there are ample reasons for Congress to make a rational decision that combating the transnational drug market, which is the source, in fact, of all cocaine in the United States, 100 percent of the cocaine in the United States comes through the international drug trade, and combating that on the high seas in cooperation with our international treaty partners. We've made agreements to combat that trade to the fullest extent of the law, and Congress has found in the MDLEA that the international trafficking of drugs on vessels is a threat to the security of the United States. Those are ample reasons for the United States, for Congress, to rationally conclude that an MDLEA offense is more serious or requires additional punishment different from an ordinary drug importation case. And as to the other MDLEA arguments, I think this Court's precedent is clear, that prosecuting foreign nationals on a foreign flagged vessel is not a due process violation, is something that the United States, again, does through international treaties, which this Court has recognized gives notice that they are subject to the jurisdiction of the United States, that it is a crime that is universally condemned and attacked by this international treaty regime. So I think the standard MDLEA arguments about the powers of the Congress and the due process argument about subjecting people to prosecution in the United States for crimes committed extraterritorially have been addressed, and we rely on those precedent. Unless the Court has any further questions about the due process argument, we think that there is no even allegation of violation that would constitute a due process violation in this case, and we argue that Mr. Castillo's convictions should be affirmed. Thank you. Thank you. Mr. Rodriguez. Thank you, Your Honor. Just briefly, I wanted to get to the Zakharov case, and you asked some questions about that. Interestingly enough, in that case, which is, you know, out of the Ninth Circuit, and we rarely ever cite Ninth Circuit cases, but this one's being cited by the government, it was a five-day search of the vessel. On the fifth day, after a second Coast Guard crew arrived, they were able to find 9,200 kilos of cocaine hidden behind fuel tanks, and then they had to take their long journey from the south of Mexico over to San Diego. Interestingly enough, in Zakharov, you know, that's always the case we cite for the fact that a nexus should be required because the Ninth Circuit held in that case that in order to validly determine equal protection, you know, that the law comports with equal protection, there has to be a nexus to the United States, and they did an analysis in Zakharov and determined that there was a nexus, which leads me to my last point, and that is the argument that I don't think this court's had before it on any of these appeals is that the fact that you do not have to find a nexus, and it's not a part of the law at all whatsoever that there has to be any tie to this vessel, means that the rational basis that the government's telling you is the purported rational basis for the distinction really isn't that because, in fact, you can find any vessel anywhere in the world and apply this rational basis that they give you, but then when we go to court, we don't have to prove that this vessel had anything to do with the United States at all. So how does a vessel that has nothing to do with the United States whatsoever at all fit within this rational basis? I think it's just going in circles, and no disrespect to the court's prior opinions. Those were plain error reviews. I believe plain error review on both of them, but the court did hold that had it looked at at de novo, it would have also reached the same conclusion. I just ask this court to really think about this a little longer. This delay, in any other context in this country, if we brought a person and held them at the sea for six days, 19 days before they go to a magistrate, I think any other context, Your Honors, we would just find that deplorable and a violation of due process. But we've made so many exceptions for these high-sea crimes of people who don't even have any connection to the United States that all the exceptions of now, in our opinion, just violate the Constitution in every way. And this is a great case to show how my client took 19 days to even get here and took 19 days to appear before a court. And I think under any other circumstance, under any other type of criminal case anywhere in this United States, that would just be considered reprehensible. And I don't think there should be an exception for these cases. And thank you for your time. Thank you. Thank you, Mr. Rodriguez. We appreciate you accepting the appointment of the court. Our third case.